UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

KECIA KEMP,                                         :
                                                    :
                            Plaintiff,              :
                                                    :
            - against -                             :    **MEMORANDUM DECISION AND**
                                                    :    **ORDER**
NEW YORK CITY DEPARTMENT OF                         :
HEALTH AND MENTAL HYGIENE, ROSE                     :    18-cv-5453 (BMC) (PK)
TESSLER-HANDLER, and BRIAN TORO,                    :
                                                    :
                            Defendants.             :

------------------------------------------------------------ X

**COGAN**, District Judge.

Plaintiff *pro se* brings this action under 42 U.S.C. § 1981 and Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") for racial discrimination, and

under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*. ("ADA"), the

Family Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*. ("FMLA"), and corresponding

provisions of state law, alleging that she was wrongfully terminated from her job as a public

health advisor in the Bureau of Sexually Transmitted Disease of the New York City

Department of Health and Mental Hygiene ("DHMH"). Defendant has moved to dismiss

plaintiff's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the

reasons below, the motion [16] is granted in part.

## BACKGROUND

Plaintiff submitted a complaint and an amended complaint using the U.S. Courts

Administrative Office form *Pro Se* 7. The caption of the amended complaint names only

DHMH, but the form lists two other defendants, Rose Tessler-Handler f/k/a Rose Tessler, who

was the Director of the Employment Law Unit of DHMH, and Brian Toro, who was plaintiff's

supervisor. There are no non-conclusory factual allegations in either complaint but plaintiff has annexed documents, and defendants have included more documents to complete the story told by plaintiff's documents, from which the following facts can be gleaned.

Plaintiff began work as a Public Health Advisor for DHMH on September 8, 1997. She was advanced to Level II of that same title in 2000. At both levels, plaintiff's duties involved contacting physicians and laboratories to retrieve information about positive results on tests for sexually transmitted diseases.

At some point prior to May 2012, DHMH transferred plaintiff to its Central Office after receiving complaints that she was harassing coworkers, including that she was using racially derogatory language, breaching confidentiality, and disrupting the work of the clinic. But plaintiff continued to have difficulties with others in the workplace following her transfer. For her part, plaintiff also made complaints about derogatory comments by a female lobby security officer, and plaintiff expressed her belief that her (plaintiff's) life was in jeopardy.

DHMH convened a meeting on plaintiff's allegations, although prior to that meeting, it had learned that the lobby security officer was not one of its own employees, but the Fire Safety Director for the building. The meeting was between the building manager for the Central Office (James Durrah); plaintiff's union representative; the Fire Safety Director; DHMH's Chief of Police; and others. At the meeting, the Fire Safety Director said that she did not know plaintiff personally and that she had not made any statements against plaintiff. When it came time for plaintiff to speak, she declined and left the room. DHMH closed her complaint as unfounded.

Things became worse in 2015 when plaintiff made other complaints that her work was being hijacked, that coworkers were disrespecting her, and that she would begin treating those other employees the same way they were treating her. On July 30, 2015, the Senior Medical

Director for the Bureau of STD, who was new to the job and did not know plaintiff, complained to her supervisor that multiple colleagues had seen plaintiff talking loudly and with "hostile body language" to another employee for 10 to 15 minutes. The doctor described plaintiff's conduct as "distracting, unprofessional, and disruptive to many coworkers that were present." Plaintiff continued to complain about her treatment by coworkers, and DHMH continued to investigate and reject them.

On October 28, 2015, plaintiff complained to her supervisor, union representative, and others that the law department of DHMH was monitoring her telephone calls. Plaintiff knew this, she said, because her speed dialing feature was activating very quickly, and whenever anyone left a message on her telephone, the playback was also very fast. This was followed several weeks later by an email from plaintiff to the Chief of Staff of the Commissioner of DHMH. In that email, plaintiff complained that when she scanned her identification card to enter the building every morning, the lobby security officers screamed at her that she was going to be prosecuted and sent to jail for 20 years.

About five weeks later, plaintiff was riding an elevator with two employees from another bureau who she did not know and who did not know her. When they got off the elevator, plaintiff followed one of the employees to that employee's supervisor and complained that the two employees had been gossiping about her in the elevator. Plaintiff told that supervisor that these two were among over 50 women employees in the building who were gossiping about her. Plaintiff attributed this to jealousy because plaintiff was not bisexual or gay. The supervisor investigated and determined that the two employees had only been talking about canning fruit preserves for the upcoming Christmas holiday, and that plaintiff had stared at them while they

did so.  That supervisor reported the incident in writing to plaintiff's supervisor, concluding that

"I am sure you will agree that this is unacceptable behavior for anyone working in this building."

Within a couple of weeks after that incident, DHMH directed plaintiff to a private

psychiatrist, Dr. David Salvage, for an evaluation pursuant to N.Y. Civil Service Law § 72.  Dr.

Salvage examined plaintiff and reviewed her complaint emails and other documentation

concerning the various incidents that plaintiff had with her coworkers.  Dr. Salvage concluded

that:

> her behavior [is] congruent with a diagnosis of Other Schizophrenia Spectrum and
> Other Psychotic Disorder as her pathology involves not only delusions, but
> disorganized thinking and disturbances of behavior in her relations with her co-
> workers.  In addition, it is likely that a psychotic process is influencing her poor
> performance in the cognitive portion of the examination given that she has been
> able to attain a Master's Degree and to function at her job relatively well until the
> past year. . . . Given that her job description does specify that she would need to
> be able to function with "some latitude for independent judgment, imitative and
> unreviewed action and decision" and that her job focus is on areas that require
> intact judgment – such as reviewing epidemiological data and health risk
> assessments, it is my strong clinical opinion that she is not able to function as a
> Public Health Advocate Advisor II at the present time.

In response to this report, on or about June 29, 2016, DHMH placed plaintiff on involuntary

medical leave.

Pursuant to CSL § 72, plaintiff exercised her right to a hearing before a neutral Office of

Administrative Trials and Hearings ("OATH") Administrative Law Judge.  The OATH ALJ

found plaintiff's allegations of persecution to be delusional.  The ALJ noted that plaintiff

"repeatedly interrupted the proceedings, gave non-responsive answers to questions, changed

topics, and said things that made no sense."  Plaintiff appealed that decision to another separate

City agency, the Department of Citywide Administrative Services, which upheld the decision of

the ALJ with strong language.

Consistent with CSL § 72 – which provides that if the medical disability which led to involuntary leave is not resolved within one year, then the employee may be terminated – defendant Tessler advised plaintiff by letter dated August 30, 2017 that because plaintiff had been on leave for more than one year, she had to apply for reinstatement or ask for more time to do so by October 2, 2017, or she would be terminated effective October 10, 2017. The letter further advised plaintiff that as part of her application, she had to provide a doctor's note that was "specific in describing the nature of your condition, treatment, and recovery" and "certify[ied] that you are fit to perform the duties of your position." The letter also included a hyperlink to forms for the application.

It does not appear that plaintiff made any submissions in response to August 30th letter, and by letter dated January 18, 2018, DHMH terminated plaintiff's employment. That letter also advised plaintiff that she had one year, pursuant to CSL § 73, to seek reinstatement. It further advised her that pursuant to the ADA, plaintiff would be entitled to a reasonable accommodation if one was available that would permit her to perform her duties.

The documents annexed to plaintiff's amended complaint suggest that she applied for reinstatement on or about March 15, 2018. Those documents include a psychiatrist's note bearing that date. The note was cursory, however, stating only that "patient is mentally intact and is no danger to herself and others noted at this time. [sic]. Patient can return to her normal duties as of 04/09/2018." DHMH advised plaintiff by letter dated April 9, 2018 that the note was insufficient and that DHMH needed medical records showing plaintiff's medical history, treatment and recovery, and psychological progress notes to move forward with her reinstatement application. It does not appear that plaintiff responded to the April 9th letter.

In opposing defendants' motion to dismiss, plaintiff has submitted an affidavit which, although difficult to understand, appears to amplify her complaints to some extent.  First, she asserts that she filed an action in the Southern District of New York in 2014 (no details are provided as to that action) against unspecified defendants and was told by an DHMH person named Padilla that if she moved forward with that lawsuit, DHMH would "destroy her ability to get ahead."  Second, in 2014 to 2015, she requested an FMLA leave of absence and also that she wanted to resign, but the manager of her Bureau, Sam Sebiyam, told her "to stick around."  Third, when plaintiff testified as a witness in a criminal case in Nassau County, DHMH refused her request to transfer to Manhattan to avoid being retaliated against for being a witness, despite the District Attorney having urged DHMH to make such a transfer.

In addition to the instant action (and the Southern District of New York action to which plaintiff has referred), plaintiff has brought numerous other judicial and administrative proceedings to challenge either her placement on involuntary leave or her termination.  These include:  (1) a prior action in this Court, Kemp v. City of New York Department of Health, No. 16-cv-1080 (E.D.N.Y. Feb. 4, 2017) ("Kemp I"), asserting ADA, FMLA, and Title VII claims, which this Court dismissed (the last without prejudice to refiling after exhaustion of administrative remedies)[1]; (2) a state court action commenced on or about January 25, 2018, in which plaintiff sued Tessler, Toro, two doctors, and her union;[2] (3) an attorney grievance against Tessler before the Grievance Committee of the Second Department; and (4) an administrative complaint with the New York State Division of Human Rights ("SDHR"), in which, by decision

---

[1] Plaintiff appealed the dismissal of Kemp I, but then withdrew the appeal.  See Kemp v. New York City Dep't of Health, No. 17-540 (2d Cir. June 8, 2017) (Mandate granting plaintiff's motion to withdraw her appeal).

[2] The status of the state court proceeding is unclear.  It appears from the public documents that defendants have submitted that there was a motion to dismiss pending at the time their motion was filed in the instant action.  Defendants ask the Court to take judicial notice of the summons with notice in that case, which the Court does as plaintiff has not objected to that in her opposition.

dated September 25, 2018, the agency found "a legitimate, non-discriminatory reason to terminate Complainant's employment. Complainant was found, after examination by two doctors – psychiatrists not employed by Respondent – to be unfit to perform the duties of her position, based on examinations conducted in December 2015 and December 2017 after she sought reinstatement." DHR therefore denied relief.

## DISCUSSION

The Court must construe *pro se* pleadings liberally, see Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)), and interpret them "to raise the strongest arguments that they suggest," Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 474-76 (2d Cir. 2006) (internal citation omitted). But a *pro se* complaint must still plead enough facts to state a claim for relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation omitted). Although "detailed factual allegations" are not required, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555). Similarly, a complaint does not state a claim "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557).

The issue before this Court is not predominantly an Iqbal/Twombly issue. Although plaintiff's amended complaint is composed of the typical "naked assertions," the documents she annexes to that pleading, and the additional documents that defendants have annexed relating to her documents, provide some additional context for the Court to address plaintiff's claims.[3]

---

[3] In the context of a Rule 12(b)(6) motion, a complaint is deemed to incorporate annexed documents, and a defendant is permitted to submit additional documents on the motion if the documents annexed to plaintiff's

7

## I. 42 U.S.C. § 1981

The Court can readily dispose of plaintiff's racial discrimination claim under 42 U.S.C.

§ 1981. Defendants argue that § 1981 does not give rise to a separate claim for relief apart from

42 U.S.C. § 1983,[4] citing <u>Duplan v. City of New York</u>, 888 F.3d 612, 619-21 (2d Cir. 2018); that

plaintiff has failed to make allegations about a policy or practice by DHMH and thus has no

claim under <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658 (1978); and that

plaintiff's § 1981 (or § 1983) claim and state law claims are barred by the SDHR decision, citing

<u>Peguero-Miles v. City University of New York</u>, No. 13-cv-1636, 2015 WL 4092336, at *7

(S.D.N.Y. July 6, 2015), and <u>Forman v. City of New York</u>, No. 2017 WL 1167334, at *6

(S.D.N.Y. March 27, 2017). These are all valid grounds for dismissal, but the main ground is the

first one that defendants invoke, namely, that there is not a single factual allegation or reference

in plaintiff's amended complaint suggestive of racial discrimination.

The problem is not measuring whether the factual allegations fall short of a plausible

claim – it is that plaintiff's amended complaint and particularly the annexed documents preclude

even a conceivable racial discrimination claim. <u>See</u> <u>Twombly</u>, 550 U.S. at 570 (pleading must

cross line from "conceivable" to "plausible"). In fact, as defendants point out, the Court is not

even sure to which minority group plaintiff belongs – in her first action in this Court, she alleged

---

pleading tell only part of the story. <u>See</u> <u>Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.</u>, 62 F.3d 69, 72 (2d Cir. 1995).

Defendants also ask the Court to consider the documents under "Federal Rule of Civil Procedure 106" (they mean Federal Rule of Evidence 106), but it is not clear that Rule would be applicable on a Rule 12(b)(6) motion, since such a motion is confined to the face of the complaint and documents fairly incorporated therein by reference. Some of defendants' documents are fairly incorporated by reference in plaintiff's amended complaint and its documentary attachments; others are public records to which plaintiff has not objected.

[4] The Court would construe plaintiff's citation to 42 U.S.C. § 1981 as one to 42 U.S.C. § 1983, since she is a *pro se* litigant, but for the reasons set forth above, it wouldn't make any difference.

that she was Native American, but in her current pleadings, she alleges "Black/Native American."

## II. Title VII

In Kemp I, the Court dismissed plaintiff's Title VII claims subject to administrative exhaustion. Here, plaintiff has attached to her amended complaint two form right-to-sue notices, one dated August 9, 2016 and the other April 18, 2018. But plaintiff did not attach the underlying EEOC charges, so the Court has no way to determine when (either in 2016, 2018, or some other time) plaintiff administratively exhausted her Title VII claims – or whether she has exhausted them at all.

Even assuming plaintiff properly exhausted her Title VII claims, however, they must also be dismissed. Plaintiff indicates in her amended complaint that defendants allegedly discriminated against her because of her "Black/Native American" race, in violation of Title VII. But, as mentioned above, nowhere in plaintiff's amended complaint or the documents annexed to it does plaintiff include any facts suggesting discrimination on the basis of her race or national origin. These claims have no merit as a result.

## III. ADA

Defendants argue that plaintiff's claims under the ADA must be dismissed because they are barred by *res judicata*. Defendants are partially correct: plaintiff's claims are barred by *res judicata* to the extent plaintiff did raise or could have raised them in Kemp I. Cf. generally Marcel Fashions Group, Inc. v. Lucky Brand Dungarees, Inc., 898 F.3d 232, 236-37 (2d Cir. 2018) (res judicata bars not only claims that were litigated but also claims that could have been raised arising out of the same nucleus of operative fact); see also Woods v. Dunlop Tire Corp., 972 F.2d 36, 38 (2d Cir. 1992) (*res judicata* "prevents a party from litigating any issue or

defense that could have been raised or decided in a previous suit, even if the issue or defense was not actually raised or decided").

The Court dismissed plaintiff's complaint in Kemp I on February 4, 2017. Thus, only plaintiff's ADA claims based on events occurring after that date could possibly survive in this action. Those claims seem to focus on defendants' failure to reinstate plaintiff in April 2018 despite the doctor's note she submitted with her application for reinstatement. Reading the amended complaint to incorporate the strongest arguments it suggests, plaintiff has sufficiently pled that she was denied a reasonable accommodation under the ADA when defendants denied this application.

But the limited record before the Court lacks detail on what exactly transpired after Kemp I. As a result, plaintiff's factual allegations are confusing. Plaintiff must therefore submit a second amended complaint within two weeks of the date of this order, which includes (1) only her ADA claims which arose after February 4, 2017, and nothing else; and (2) more factual allegations tending to support the basis of those ADA claims. Specifically, plaintiff's second amended complaint must set forth what accommodations she requested, when she requested each of them, and how defendants responded (if at all) to each request.

## IV. FMLA

Defendants make the same *res judicata* argument with respect to plaintiff's FMLA claims. Although any post-Kemp I FMLA claims could in theory survive, plaintiff has not raised any valid claims here.

As defendants' point out, plaintiff's amended complaint does not assert any facts that relate to or could establish a violation of the FMLA. Nor could it. The FMLA guarantees 12 workweeks of leave each year if an employee suffers from, among other things, a serious health condition that makes the employee unable to perform the functions of her position. See 29

U.S.C.A. § 2612. Because plaintiff was not working during the operative time period for which she can sue in this case (February 4, 2017 to the present), there was no employment from which plaintiff was guaranteed 12 weeks off under the FMLA. In other words, plaintiff did not have any FMLA rights which defendants could violate or otherwise interfere with at this time.

Although plaintiff's opposition to defendants' motion to dismiss makes reference to the FMLA with respect to events that happened in 2014 and 2015, those claims are barred by *res judicata* based on **Kemp I**.

Plaintiff's opposition also indicates that defendants might have impacted one of plaintiff's "witnesses," Mr. Griffith's, FMLA rights, but plaintiff does not have standing to pursue any purported violations of Mr. Griffith's federal rights.

Plaintiff's FMLA claims must therefore be dismissed.

## V. State Law Claims

Defendants argue that the Court should dismiss plaintiff's state law claims because they are barred by the SDHR decision affirming defendants' denial of plaintiff's application for reinstatement.

"[W]hen a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." Univ. of Tennessee v. Elliott, 478 U.S. 788, 799 (1986). New York courts will give conclusive effect to an SDHR decision when "(1) the issue sought to be precluded is identical to a material issue necessarily decided by the administrative agency in a prior proceeding; and (2) there was a full and fair opportunity to contest this issue in the administrative tribunal." Peguero-Miles v. City Univ. of New York, No. 13-CV-1636, 2015 WL 4092336, at *7 (S.D.N.Y. July 6, 2015) (citing Jeffreys v. Griffin, 1 N.Y.3d 34, 769 N.Y.S.2d 184 (2003)).

The SDHR decision has preclusive effect here.  Plaintiff filed a verified complaint with the SDHR, which raised identical discrimination claims to those presented in this case.  The SDHR conducted an investigation and provided plaintiff an opportunity to review information and evidence gathered in that investigation.  Following that process, the SDHR found that defendants had a legitimate non-discriminatory reason to terminate plaintiff and dismissed her complaint.  Because plaintiff is precluded under New York law from relitigating these discrimination claims, they are dismissed.

## CONCLUSION

Defendants' motion to dismiss [16] is GRANTED IN PART.  Plaintiff is directed to file a second amended complaint that pertains only to her ADA claims arising after February 4, 2017, containing the information set forth above, within two weeks from the date of this order.

**SO ORDERED.**

$\overline{\hspace{5cm}}$
U.S.D.J.

Dated: Brooklyn, New York
       January 3, 2019